IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 2:24cr76 |
| | ) | |
| JUSTIN WHICHARD | ) | |

## DEFENDANT'S POSITION ON SENTENCING

Justin Whichard's actions were inexcusable. The government is right to identify Justin's threats to expose his victims' images as particularly aggravating. But there is significant mitigation in this case as well. Justin was only 22 years old at the time of the offense, his upbringing was marred by adverse childhood experiences, his judgment at the time of the offense was clouded by heavy substance use, and his confession on the day of his arrest reveals the kind of self-reckoning that goes beyond acceptance of responsibility under the Guidelines.

The statutory range of imprisonment is 15 to 30 years. We can understand why the government might argue and how the Court might conclude that a sentence at the mandatory minimum is inappropriate considering the aggravating facts. But our significant mitigation also strongly counsels against a sentence near the statutory maximum. A sentence of not more than 20 years would be on par with the average sentence nationally. It would balance the aggravating and mitigating facts. And it would be enough to reflect the seriousness of the offense, provide just punishment, and deter others from committing similar offenses.

If the Court imposes a 20-year sentence, even with maximum good-time credit, Justin will be older at release than his lawyer is now. For a 22-year-old defendant, 20 years is quite literally a lifetime. That is sufficient under § 3553(a).[1]

---

[1] The defense has reviewed the PSR and has no objections.

## I.     Had Justin grown up differently, would we be here?

Justin's childhood was filled with hardship and trauma. Dad cheated on Mom, then left her and baby Justin behind. He moved to Florida when Justin was only four years old. PSR ¶ 80. Dad's alcoholism—he recently finished serving a prison sentence for his *sixth* DUI—contributed to his



absenteeism as a father. But there was also a degree of apathy. Justin remembers his dad not being there for him. He would send a present in the mail for a birthday, but Justin would be puzzled opening the gift. Why would Dad send this but not bother to call in two years? Justin saw his dad nobly act as a "stepdad" to all these other kids when Dad struck up relationships with new women over the years. But he was never there for his own kids. For the brief periods during which Dad would pop up in his son's life, drinking remained the priority. Justin remembers that when he stayed with his dad for a short stint as a 14-year-old, Justin would eat dinner every night with his father's girlfriend because Dad was either unconscious or wasted. PSR ¶ 81. Justin charitably excuses his dad's absenteeism, saying that he probably just wasn't ready to be a dad when he fathered Justin at age 17.

Justin and his mom (pictured together below) share a close relationship.



But Nicole is the first to admit that she didn't give Justin what he needed growing up. She was struggling with her own demons: drug addiction, mental illness, crime, an abusive partner, extreme poverty, the loss of a parent. This led to a chaotic existence. Justin's family was poor growing up. Ketchup-sandwiches poor. There was often not enough to eat. The utilities would get cut off. They were forced to leave a trailer because it became too cockroach infested and the plumbing backed up. That led to stints at a series of motels. Nicole was dating Mr. Woosley whose drug operation landed him in federal prison and her in federal court on drug charges as well.

When Mr. Woosley went to prison, Justin felt like he needed to step in to help take care of the family. Not long after, Nicole's dad got cancer and she was going back to Richmond to take care of him. At age 12, Justin was charged with taking care of his 1 and 2-year-old siblings. He would shoplift so they had clothes to wear and food to eat. As a sixth or seventh grader, he was running a household, stealing to provide, smoking weed, and on his way toward dropping out of school. The only positive male role model in his life—his grandfather—died the next year. PSR ¶ 80.

When Mr. Woosley got out of prison, he and Nicole married. Reuniting in marriage fueled

their mutual drug addictions which fueled Mr. Woosley's physical abuse of Nicole. Justin had to watch helpless as his mother was beaten and knocked around. PSR ¶ 81. Then the same month as his sweet 16, Justin stumbled across his mom and Mr. Woosely overdosed on heroin. Justin called 911 and they were revived. *Id.* But CPS came to take Justin away the next day. *Id.* At first, he was sent to live with his grandmother, but CPS removed him from that home too. He ended up in the foster care system, bouncing between group homes. During this time, he was separated from his siblings who were also in foster care but in different placements. *Id.* Justin hated it. He hated being away from his siblings and his mom. He ran away more than once.

School likewise was a struggle. After two unsuccessful attempts at passing the ninth grade, a counselor suggested that he just try to get his GED. PSR ¶ 98. Another adult saw Justin struggling and gave up on him.

Justin's social life was stunted too. No wonder. It's hard enough for the average kid to make friends in middle and high school. For the kid from the group home, it must have been terrible. Justin would often act as the class clown. He got in trouble for acting up, a laugh from the class was one of the only positive interactions Justin had in his sad life. So it was probably worth it. When Justin was 15, one of his few close friends killed himself by setting himself on fire. PSR ¶ 81. After that, Justin didn't make many new friends. Legal trouble followed. PSR ¶ 69. He didn't graduate. Didn't attend prom.

Suffice it to say that Justin experienced multiple forms of abuse, neglect, instability, and loss. Justin's grandmother and aunt have written letters of support, which we have attached to this filing. We intend to call Nicole Woosley as a witness at the sentencing hearing to talk about her son's formative years.

Adverse Childhood Experiences, or "ACEs," are "manifestations of childhood trauma that can be defined as an experience in which a child is exposed to emotional, physical, or sexual abuse,

neglect, and/or household dysfunction before their 18th birthday."[2] "ACEs and associated social determinants of health, such as living in under-resourced or racially segregated neighborhoods, can cause toxic stress."[3] "Toxic stress, or extended or prolonged stress, from ACEs can negatively affect children's brain development, immune systems, and stress-response systems." *Id.* "These changes can affect children's attention, decision-making, and learning." *Id.* "ACEs can have lasting effects on health and well-being in childhood and life opportunities *well into adulthood.*" *Id.* (emphasis added).

According to the U.S. Department of Justice, a child being exposed to violence "triggers a traumatic disruption of biological, cognitive, social and emotional regulation that has different behavioral manifestations depending on the child's developmental stage."[4] Exposure to violence causes "abrupt changes in brain activity and altered perceptions of self, others, and the environment, leaving the child 'stuck' or 'frozen' without a way to escape." *Id.* After careful study, the DOJ concluded that "when violence is chronic or sources of support are inadequate, the result can be a severe and lasting impact on every aspect of the child's development." *Id.*

As the DOJ's 2012 report seems to comprehend, childhood trauma is not just a sad or unfortunate aspect of someone's past. It is a well-documented cause of observable, enduring changes in a person's brain that has lasting impacts. Studies have shown that childhood trauma "interferes with the normal development of the brain" and affects the "neural circuits [in] areas of the brain critical

---

[2] Brittany T. Smith, *et al.*, *Adverse childhood experiences among females in substance use treatment and their children: A pilot study*, Preventive Medicine Reports, Vol. 24, at 1 (Dec. 2021), *available at* https://www.sciencedirect.com/science/article/pii/S2211335521002618?via%3Dihub (last visited Sept. 16, 2024) (*citing* V.J. Felitti, *et al.*, *Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults: The Adverse Childhood Experiences (ACE) Study*, 14Am. J. Prev. Med. 245 (1998).
[3] CDC.gov, *About Adverse Childhood Experiences* (May 16, 2024), https://www.cdc.gov/aces/about/index.html, *archived at* https://perma.cc/K4RS-DM46.
[4] U.S. Dept. of Justice, *Report of the Attorney General's National Task Force on Children Exposed to Violence*, at 29 (Dec. 12, 2012), https://www.justice.gov/defendingchildhood/cev-rpt-full.pdf.

for emotional, physiological, psychological, and social development."[5] Studies have addressed the underlying biological phenomenon involved with childhood trauma:

> Research findings demonstrate differences between traumatized and normal brains. … During traumatic events, the central nervous system (which includes the brain and spinal cord) is overstimulated, and the physiological changes that occur can cause long-term, perhaps permanent, changes in brain structure and function. Such changes can affect memory, learning, ability to regulate affect, and social development.

*Id.* at 229. There is "abundant empirical literature demonstrating the regulatory effect of social experiences, in early life, on neurodevelopment."[6] New studies are coming out all the time that document the lasting effects of early life adversity on adult brains and decisionmaking.[7] In other words, what happens to you as a child affects how your brain develops.

And we know that these changes to the brain don't magically disappear when the person becomes an adult. As one brain scanning study phrased its conclusion, "Childhood maltreatment is associated with remarkable functional and structural changes even decades later in adulthood."[8] A publication by the U.S. Department of Health and Human Services concurs: "Disrupted brain development as a result of maltreatment can cause impairments to the brain's executive functions: working memory, self-control, and cognitive flexibility (i.e., the ability to look at things and situations

---

[5] Kathleen M. Heide & Eldra P. Solomon, *Biology, childhood trauma, and murder: Rethinking justice*, 29 INT'L J. L. & PSYCHOL. 220, at 223 (2006).

[6] *See, e.g.*, Nancy Wolff & Jing Shi, *Childhood and Adult Trauma Experiences of Incarcerated Persons and Their Relationship to Adult Behavioral Health Problems and Treatment*, 9 Int'l J. Envtl. Res. & Pub. Health 1908, 1920 (2012) ("Our finding of a positive association between trauma exposure and behavioral health symptoms and problems is consistent with previous research based on community and incarcerated samples.").

[7] *See, e.g.*, Vrinda Kalia, *et al.*, *Adverse childhood experiences (ACEs)associated with reduced cognitive flexibility in both college and community samples*, 16 PLoS ONE 12 (Dec. 2, 2021) ("Our findings provide further evidence that individuals with early life adversity exhibit reduced cognitive flexibility in adulthood."), *archived at* https://perma.cc/F855-YYVV.

[8] Udo Dannlowski, et al., *Limbic Scars: Long-Term Consequences of Childhood Maltreatment Revealed by Functional and Structural Magnetic Resonance Imaging*, 71 Biol. Pyschiatry, 286, 286 (2012), *archived at* https://perma.cc/LA2V-FYYM.

from different perspectives).”[9] This means that aside from the immediate injury children experience through maltreatment, "a child's reactions to abuse or neglect can have lifelong and even intergenerational impacts." *Id.*, at 1. As the CDC explains, childhood trauma is not something people just grow out of or get over:[10]

## Overview:

Adverse Childhood Experiences (ACEs) are potentially traumatic events that occur in childhood. ACEs can include violence, abuse, and growing up in a family with mental health or substance use problems. Toxic stress from ACEs can change brain development and affect how the body responds to stress. ACEs are linked to chronic health problems, mental illness, and substance misuse in adulthood.



**Centers for Disease Control and Prevention**
National Center for Injury Prevention and Control

## Adverse Childhood Experiences impact lifelong health and opportunities.

• Many people do not realize that exposure to ACEs is associated with increased risk for health problems across the lifespan.

This information about the lasting effects of childhood trauma, abuse, and neglect is not controversial. The DOJ, HHS, and CDC explain in these mainstream publications that childhood trauma is a real problem. It impacts brain development. And its effects are lasting.

When we talk about changes to executive functioning, the analogy to youth in sentencing is clear. Adults who experienced adverse childhood experiences have brains that make poorer decisions and lack self-control mechanisms that otherwise would exist. This provides context for

---

[9] *See* Dept. of Health & Human Services, *Factsheet: Long-Term Consequences of Child Abuse and Neglect*, at 3 (citation omitted), *archived at* https://perma.cc/5XZ6-RM9D.
[10] *See* CDC, *Vitalsigns: Adverse Childhood Experiences (ACEs)* (Nov. 2019), *archived at* https://perma.cc/5WK4-5V6R.

decisionmaking of all kinds, but most relevant here for criminal offending behavior. For the same reason that an 18-year-old defendant is less deserving of punishment because they are making decisions with an 18-year-old's brain, a person with severe ACEs is less deserving of punishment. The conduct is less blameworthy because it can be traced back to circumstances that were completely outside of the person's control.

The government writes that "there can be no doubt that his early years evoke significant sympathy." ECF No. 27, at 5. That may be true but is far from the point. Evidence of this kind "is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Conner, J., concurring)). The ACEs brain research fills in the scientific explanation for this long-held intuition. ACEs matter at sentencing because they are directly relevant to § 3553(a)'s consideration of the need for the sentence to provide just punishment. If Justin's childhood experiences contributed in any way to his commission of this offense—which seems undeniable— then he is deserving of less punishment than someone who engaged in the same conduct but did not endure his childhood.

## II.    Justin's youth at the time of the offense is a mitigating factor not taken into account by the Guidelines.

Justin was 22 years old when he committed this offense. *See* PSR, at 2 (listing date of birth) & PSR ¶ 9 (listing dates of relevant conduct). His youth at the time of the offense no doubt contributed to his offense. The Supreme Court has repeatedly recognized—in cases like *Roper*, *Graham*, and *Miller*—that inherent characteristics make young people categorically different for purposes of sentencing. As explained in *Miller*, young people "have a 'lack of maturity and an underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and heedless risk-taking." *Miller v.*

*Alabama*, 567 U.S. 460, 471 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 569 (2005)). Those Supreme Court decisions about youthful offenders "rested not only on common sense—on what 'any parent knows'—but on science and social science as well." *Id.* As the Supreme Court recently put it, "youth matters in sentencing." *Jones v. Mississippi*, 593 U.S. 98, 105 (2021).

Although these Eighth Amendment cases talk about youthfulness in the context of juveniles, "the distinguishing characteristics of youth acknowledged in *Roper* and *Miller* 'do not disappear when an individual turns 18.'" *United States v. Cruz*, No. 3:94cr112, 2021 WL 1326851, at *5 (D. Conn. Apr. 9, 2021) (quoting *Roper*, 543 U.S. at 574). This "means that courts cannot simply treat anyone over 18 as an 'adult' for sentencing purposes but must inquire whether the human being they are about to sentence is still in many respects an adolescent." *United States v. Ramsay*, 538 F. Supp. 3d 407, 423 (S.D.N.Y. 2021) "As such, some courts have found that defendants in their mid-twenties are still effectively adolescents." *United States v. Crenshaw*, No. 2:90CR117, 2025 WL 618869, at *8 (E.D. Va. Feb. 26, 2025) (Davis, C.J.). For example, in *United States v. Rengifo*, 569 F. Supp. 3d 180, 194 (S.D.N.Y. 2021), the court considered youth in sentencing for a defendant who was 23 years old at the time of his offense. Likewise, the Fourth Circuit in *United States v. McCoy*, 981 F.3d 271, 286 (4th Cir. 2020) acknowledged that the "defendants' relative youth—from 19 to 24 years old—at the time of their offenses" was a mitigating factor supporting sentence reductions. Recently, this Court held that, for a defendant who was "22 years old when he committed the instant offenses, his immaturity may still have played a critical role in his commission of the [offenses]." *Crenshaw*, 2025 WL 618869, at *8. These decisions are not outliers. *See, e.g., United States v. Gallego*, Case No. 95cr284, 2025 WL 723237, at *4 (S.D.N.Y. Mar. 6, 2025) (reducing sentence, in part, because defendant was 23 when he committed the offense, noting that "psychological and scientific research—and increasingly, the law— recognize that a young adult may be more prone to reckless behavior and susceptible to outside influences"); *United States v. Lee*, Case No. 04cr11, 2021 WL 3129243, at *4 (E.D. La. July 23, 2021)

(reducing sentence, in part, because defendant "was only 23 years old at the time of the carjackings").

The Guidelines make available a downward departure based on youth at the time of the offense:

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development *into the mid-20's* and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.

U.S.S.G. § 5H1.1 (emphasis added). Justin was in his early-20s when he committed the instant offense and experienced other risk factors identified by the Guideline: "environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships." § 5H1.1. Whether the Court formally departs under § 5H1.1 or merely takes youth into account through a downward variance, youth at the time of the offense is both mitigating and directly relevant to the § 3553(a) sentencing factors.

"The need for 'just punishment' corresponds to the moral culpability of an offense." *Ramsay*, 538 F. Supp. 3d at 423. A young person's "immaturity, their susceptibility to peer influence, and their dependence mean 'their irresponsible conduct is not as morally reprehensible as that of an adult.'" *Id.* (quoting *Roper*, 543 U.S. at 570). Thus, a "just punishment" for a 22-year-old should be less severe than for a similarly situated 42-year-old. In this case, it seems quite likely that Justin's young age not only influenced his impulse control (making him more likely to engage in these online interactions) but also made him less sensitive to the risk of facing this kind of enormous penalty if he were caught.

Moreover, Justin—as the Sentencing Commission expressly acknowledges—is "more amenable to rehabilitation." § 5H1.1. The kind of sentence that might be necessary to protect the public from an older defendant is not "necessary" to protect the public from a defendant who is more

likely than most to be successfully rehabilitated.

For all these reasons, the Court should vary from the low end of the non-departure guidelines range to ensure that Justin's sentence reflects the decreased culpability and greater capacity for rehabilitation associated with his youth at the time of the offense.

### III.    Justin's judgment at the time of the offense was clouded by significant drug use.

A "history of substance abuse … is the very sort of mitigating evidence" that might well influence a factfinder's appraisal of Justin's "moral culpability." *Earp v. Ornoski*, 431 F.3d 1158, 1179 (9th Cir. 2005). Drugs impair judgment and affect decision making. For Justin, he was using large amounts of LSD for two or three years leading up to this offense. PSR ¶ 96. He "would sometimes view pornography for 6 hours at a time while on LSD." PSR ¶ 18. Justin's heavy LSD use during this period must have influenced his judgment and decision making. Obviously, that does not excuse his behavior. But, like his age and adverse childhood experiences, it does contextualize it. And drug use can be addressed through treatment. Justin's heavy substance use during and leading up to the instant offense is a mitigating factor this Court should consider when deciding upon the appropriate sentence.

### IV.    Justin's statements at the time of arrest show that he truly grasps the gravity of his offense and wants to be better.

At the time of his arrest Justin consented to be interviewed by agents. PSR ¶ 18. It is undisputed that "[t]hroughout his interview, [Justin] was open and honest with case agents and provided his cellular telephone password to allow them access." *Id.* In its sentencing filing, the government acknowledges that "Whichard was candid with law enforcement once he was caught and the number of victims he identified aligns with the investigation." ECF No. 27, at 5. In other words, everything Justin told law enforcement was either subsequently corroborated or at least has never been contradicted. The PSR details the substance of Justin's statements. PSR ¶ 18. But to get a sense for the nature of his contrition, the Court needs to see some of the interactions between Justin and the two agents who interviewed him that day. For that reason, the defense intends to play excerpts from

the video of the interrogation at sentencing. This video shows a young man truly coming to grips with what he did and begging for help.

## V.   A sentence of 20 years would avoid creating unwarranted sentence disparities under § 3553(a)(6).

The defense's requested sentence of not more than 240 months would not create unwarranted sentence disparities between similarly situated defendants who committed similar offenses. The first step in analyzing whether a sentence of 240 months in this case would create an unwarranted disparity is to assess just how different the sentence we are requesting is from the average sentence imposed on similarly situated defendants. National sentencing data can help with that question.

The Sentencing Commission's Interactive Data Analyzer shows that the vast majority of production defendants age 21-25 in Criminal History Category I receive sentences less than 20 years (the dark blue section below).[11] And nearly three quarters of such defendants receive sentences less than 25 years (the dark blue and orange sections combined).



Distribution of sentence length: § 2G2.1, CHC I & age 21-25

■ Less than 20 years   ■ 20 to less than 25 years
■ 25 to less than 30 years   ■ More than 30 years

---

[11] U.S. Sent'g Comm'n, *Interactive Data Analyzer*, *available at* ida.ussc.gov (based on data captured Sept. 17, 2025). The figure includes the 298 cases reported to the commission that meet the following criteria: Fiscal years 2020-2024, Age 21-25, Guideline § 2G2.1, Criminal History Category I.

Based on this data, the sentence we request would not create *any* disparity. It would be consistent with the sentence most similarly situated defendants receive.

To get the best sense of how these cases are treated generally across the country, however, we consulted the Sentencing Commission's "Individual Datafiles" from fiscal years 2019 to 2023. Over those five fiscal years, there were 92 sentencings in which a defendant under the age of 26 pleaded guilty to one count of production and fell in Criminal History Category I.[12] The average sentence in those cases was ***246 months***. *Id.* If you filter that dataset to show only defendants with a total offense level of 42, the average sentence was ***240 months***. *Id.* So, again, the sentence we are requesting would not create any disparity between Justin and similarly situated defendants convicted of similar conduct.

Another possible data point for assessing the existence of any sentence disparity and the degree to which it is warranted is to look at examples of sentences other defendants received for the same or more serious offense conduct. Here are a few examples:

---

[12] The data used for these analyses were extracted from the U.S. Sentencing Commission's "Individual Datafiles" spanning fiscal years 2019 to 2023. The Commission's "Individual Datafiles" are publicly available for download on its website. U.S. Sent'g Comm'n, Commission Datafiles, https://www.ussc.gov/research/datafiles/commission-datafiles. A copy of the Excel file with the following filters applied is maintained in Mr. Whichard's file at the FPD and has been provided to the U.S. Attorney's Office (a copy can be provided to the Court also if requested):

- NOCOUNTS = 1 (cases with one count of conviction)
- NWSTAT__ = 182251, 182251A, 182251A1, 182251A5B, 182251E (Because the data are recorded in a way that doesn't clearly distinguish § 2251(a) from § 2251A, this is the first step we took to narrow the data set to § 2251(a) by excluding any counts that were not 2251A or 2251E)
- PORNMIN = 180 (This is the second step to narrowing the dataset to § 2251(a), by which we included only cases with a pornography-based 15-year statutory minimum)
- AGE = <26 (all defendants age 25 or younger)
- XCRHISSR = 1 (final criminal history category of I)
- ACCTRESP = -3 (received three-level reduction for acceptance of responsibility, which is what we used to identify cases in which the defendant pleaded guilty)

The Codebook for all of the variable definitions is available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/datafiles/USSC_Public_Release_Codebook_FY99_FY23.pdf.

Cases involving sextortion component

In *United States v. Creary*, the defendant "posing as a 14–year–old boy, engaged in internet chats (using a web camera) with three underage girls and encouraged them to take off their clothes and pose in sexually suggestive poses." 382 F. App'x 850, 853 (11th Cir. 2010). "Thereafter, Creary threatened one of the victims, V-2, a 13-year-old girl, that he would send her nude photos to friends and relatives if she did not provide him with more pictures." Factual Basis for Plea, ECF No. 18, at 1 in *United States v. Creary*, No. 4:08cr42 (N.D. Fla. Oct. 16, 2008). "And Creary's computer contained thousands of online chats where he requested naked pictures from unknown females and over 600 images of child pornography." *Creary*, 382 F. App'x at 853. The stipulated facts supporting the plea provided that "a review of these chats showed that defendant's computer contained logs of approximately 7,600 Yahoo chats and over 42,000 pages of MSN chats" and "almost every chat … involved defendant requesting naked pictures from unknown females." ECF No. 18, at 4 in *Creary*, No. 4:08cr42. "In one of these chats, a pre-pubescent girl complies with defendant's explicit instructions to expose her vagina, to take her fingers to spread her vaginal area. and to find a 'pencil or pen' and insert it- in her vagina." *Id.* Web cam captures on Creary's computer contained "the video of this young girl doing exactly that." *Id.* Unlike Justin, the defendant in Creary "was approximately 30 years old at the time." *Id.* at 1. Creary was sentenced to 210 months. *Creary*, 382 F. App'x at 851.

Over two years, the defendant in *United States v. Vivirito* "used social-media and messaging applications to persuade and attempt to persuade over a dozen minor girls to send him child pornography." Br. of U.S. in *United States v. Vivirito*, 2023 WL 166992, at *2. Vivirito "lied about his age—claiming to be a teenager and not a grown man in his twenties—sent explicit messages about wanting to meet the minors in person and to 'fu**' them, sent images of his penis and videos of him masturbating, and requested and received videos and images of his minor victims engaging in sexually explicit conduct." *Id.* When one of his victims—a 12-year-old—"expressed reluctance to provide

videos, *Vivirito threatened to expose their sexual text exchanges unless she complied" and he "also threatened to kill himself.*" 65 F.4th 341, 342 (7th Cir. 2023), *reh'g denied,* No. 22-2167, 2023 WL 3688103 (7th Cir. May 26, 2023). These threats prompted the young girl to "send Vivirito videos of herself penetrating her vagina and anus with the handle of a hairbrush." *Id.*

Vivirito was arrested for this conduct by state authorities in December 2018, but that didn't stop him. Br. of U.S. in *Vivirito,* at *4. "Notwithstanding this pending state charge, defendant continued to use the Internet and social media-in violation of his state court bond conditions-to send sexually explicit messages to minor victims." *Id.* "For example, several months after his arrest, in April 2019, defendant exchanged messages with a 13-year-old victim, asking her to show defendant '[y]our pus**' and 'bare tits'; commenting, 'I'm gonna cum for u on vidchat tn [tonight] bby [baby],' 'I cant wait to fu** you,' and 'Im gonna punish you'; and making specific demands for videos of the victim, such as, 'Show daddy that a**hole bby,' 'Can daddy hear u moan load [loud] asf,' and 'Can u fu** your pus** with that black dildo.'" *Id.* at *5 (modifications in original). "Later on, defendant repeatedly demanded that this particular victim call or FaceTime defendant *and threatened otherwise to slit his wrist and kill himself.*" *Id.* (emphasis added). At sentencing, the district court reflected on the nature of the offense:

> I read everything that was provided to me. I looked at everything. And some of the factors of the offense that troubled me the most was the coercive nature of the text messages. It was the way that you spoke to them, the way that you threatened them, threatened them with potential legal harm, threatened them with revealing what they had done to others.... Every single one of them had that fear, that terror of knowing that you had the secret that you would force them into this and you could have harmed them by releasing it in public. That--I can't mitigate that. That is just appalling.

*Id.* at *21 (quoting district court). Still, Vivirito "was sentenced to 216 months' imprisonment." *Vivirito,* 65 F.4th at 342.

In *United States v. Kisling,* "while posing as a teenaged girl online, Defendant, Michael Kisling,

befriended a 14 year-old girl living in Wisconsin, and enticed her to send him sexually explicit nude photographs of herself, after telling her how to pose for and take the photos of her breasts, buttocks and vagina." No. 1:14CR0157, 2015 WL 5055512, at *1 (N.D. Ohio Aug. 25, 2015). Kisling "showed his gratitude by hacking into the 14 year-old's Facebook account and posting her sexually explicit nude photographs for all to see." *Id.* "When the victim's mother attempted to intercede, Defendant threatened the mother," writing among other threats: "'AND BTW, I NO WHERE YOU LIVE NOW'" [sic], and taunting '... if I find out for one moment I might get in trouble for this I have the skill to release those photos of your daughter to 75% of the internet ... SO LEAVE ME THE F* *K ALONE OR ELSE.'" *Id.* "As if those bone rattling threats were not enough, he added, '... btw I've posted those pics in a lot of porn sites so HA!'" *Id.* "After a period of unexplained and false calm, almost two and one-half years later, Defendant started up again." *Id.* "This time, he posted the sexually explicit nude photographs on a Facebook page he created using the stolen identification of the victim's high-school aged brother." *Id.* "Because Defendant not only induced the production of the sexually explicit nude images made by the 14 year-old victim which he distributed via computer, he also received and possessed 149 videos and 40 photographs of child pornography, his advisory guidelines calculation, therefore, included references to both U.S.S.G. § 2G2.1 (production) and U.S.S.G. § 2G2.2 (trafficking, possession), in addition to U.S.S.G. § 2B1.1(a)(2), for identity theft." *Id.* The court imposed a total term of incarceration of a term of incarceration of 240 months, consisting of concurrent sentences on various counts. *Id.* at *4.

In *United States v. Barrios*, the defendant "was in contact with more than a dozen minor females during the course of those years …and was in contact with a 14-year-old girl referred to as Victim #4 the day before the agents arrested him and searched his home." Gov't Sent'g Memo, ECF No. 57, at 4 in *United States v. Barrios*, No. 3:15cr9 (S.D. Iowa May 18, 2016). Prosecutors explained that Barrios's "conduct has been consistent: he finds young girls (13-16 years old) on-line, gets them to send him

nude pictures, and then extorts additional and more graphic pictures from them." *Id.*

> [H]e victimizes them by grooming them, cajoling them, and then demeaning them. He uses their frailties, immaturity, and insecurities to obtain pornography from them and when they refuse to continue to provide him what he wants, he extorts more from them. He tormented one minor female to the point where she attempted suicide by taking an overdose of pills. His response was callous and cold. He told her to go ahead and die. This event did not stop his activity. He continued to contact young girls around 14 years of age and continued to seek and obtain pornographic images of them. This happened on Christmas day of 2014 and right up to the day before he was arrested.
>
> Nothing about the pleas from the girls for the defendant to stop, or the driving of one girl to end her own life, had any effect on the defendant. It took this prosecution to put a stop to it. If not, he would most certainly still be doing it. There is little reason to believe that he will not do something like this, or worse, again.

*Id.* at 6. On these facts, "the Court sentenced Barrios to 168 months in prison." *Barrios v. United States*, No. 4:17cv182, 2017 WL 11615523, at *1 (S.D. Iowa Oct. 5, 2017).

In *United States v. Arroyo*, a 23-year-old defendant struck up an online relationship with Jane Doe #1, a 12-year-old girl; Arroyo did so by l saying he was only 17 years old. 312 F. Supp. 3d 347, 348 (E.D.N.Y. 2018). Jane Doe #1 initially said she was 13, but both she and Arroyo ultimately admitted their true ages. *Id.* Over a period of two years, Arroyo solicited and received numerous images of Jane Doe #1 in various stages of undress and they masturbated together over online video sessions. *Id.* When the child tried to end the relationship, Arroyo "threatened to post the pictures of her online" so she continued the relationship. *Id.* When she "eventually broke off the relationship" she "began receiving harassing messages from Defendant's affiliates urging her to re-establish contact with Defendant" and then "Defendant posted naked pictures of Jane Doe #1 online." *Id.* "Defendant's affiliates continued harassing Jane Doe #1 and posting her pictures on various websites." *Id.* The evidence showed that Arroyo also received naked pictures from two other minors he met online: a 16 year-old girl and a 14-year-old girl. *Id.* Arroyo was allowed to plead to coercion and enticement (rather than production) and he was sentenced to ten years in prison. *Id.*

<u>Cases involving more serious conduct</u>

In *United States v. Hisel*, the defendant "placed an online ad entitled 'Perv ... taboo - m4m' in which he sought 'someone into perv and taboo things ... young or incest to be specific.'" No. 4:18-CR-45(1), 2023 WL 1113142, at *4 (E.D. Tex. Jan. 30, 2023) (recounting facts of 2018 conviction when ruling on motion for compassionate release). "He began communicating with an undercover agent whom he believed to have access to an 11-year-old female seeking to engage in sexual activity with the minor child." *Id.* He sent many messages "in an attempt to meet the child in order to touch her genitals, ejaculate on her body, and engage in oral and vaginal intercourse with her." *Id.* "Hisel sent photos of himself to show the child and inquired about her interests, gifts she might like, her sexual experience, and the parameters of sexual contact with the child." *Id.*

Hisel "sent photographs of his bare chest and face and another of him holding his erect penis to the undercover agent, whom he believed to be the father of the child, to show her." *Id.*

> He requested photographs of the child. Hisel described various sexual acts he wanted to perform on the child, including: touching her genitals, kissing her, rubbing his penis on her vagina, inserting his fingers into her vagina, putting lotion on her, showering/bathing with her, ejaculating on her various body parts, and having sex with her. Further, in the chats, Hisel admitted to having prior sexual experiences with children, including touching the breasts of teenagers while working as a respiratory therapist and having sexual contact with a 6-year-old girl on two occasions when he lived in Wisconsin. Ultimately, Hisel traveled from Sherman, in Grayson County, Texas, to Plano, in Collin County, Texas, to meet the child for sex. At the time of his arrest, he was carrying a present for the child, a unicorn figurine, for which he paid $75.

*Id.* The district court in *Hisel* sentenced the defendant to 180 months (15 years) in prison. *Id.* at *1. We have 1) extensive online chats about sex with an 11-year-old, 2) travel to have sex with that child, and 3) admissions of multiple past instances of hands-on sexual abuse, including sexual contact with a 6-year-old on two different occasions.

In *United States v. Epps*, an undercover FBI agent posted in a public chatroom that he "had

access to an 11-year-old child" and the same day "Epps contacted the agent through private message." No. 21-13922, 2023 WL 316008, at *1 (11th Cir. Jan. 19, 2023). "The agent described his 'daughter' as an 11-year-old girl, and Epps asked for a photo of the agent and his daughter," and the agent sent a photo of what appeared to be an 11- or 12-year-old child." *Id.* Epps stated he "'needed' oral sex and clarified that he wanted the 11-year-old child to do it." *Id.* They fell out of touch for a while, but a few months later, Epps reached back out, explaining again "that he wanted to meet the child and 'possibly have her stroke or suck' him." *Id.* "The agent told Epps that his daughter had turned 12 and asked if Epps still wanted her to perform oral sex" and "Epps said he did." *Id.* at *2. "The agent asked if Epps was 'clean,' and Epps replied that he was and that he could use a 'flavored condom.'" Epps and the agent agreed to meet and he was arrested when he arrived at the predetermined location. *Id.* He was convicted, and the PSR included "a five-level increase under § 4B1.5(b)(1) because Epps engaged in a pattern of prohibited sexual conduct." *Id.* Still, the court sentenced him to 144 months (12 years) in prison. *Id.* at *3.

In *United States v. Oakie*, 993 F.3d 1051, 1053 (8th Cir. 2021), the defendant was convicted of molesting a 10-year-old girl. At trial, the government introduced evidence that Oakie had previously molested a *different* 10-year-old girl who "testified that when Oakie was staying with her family several years earlier, he had vaginally penetrated her while she was asleep." *Id.* At sentencing, the district court found "that the prior abuse had taken place and that it was 'somewhat strikingly similar' to what happened here." *Id.* Still, the district court imposed a 96-month (8-year) prison sentence. *Id.*

In *United States v. Davis*, the defendant responded to an online ad and proposed meeting a 14-year-old girl (who was really an undercover cop). No. 19-1696, 2021 WL 97427 (3d Cir. Jan. 12, 2021). "Davis and Marisa exchanged text messages over an eight-day period." *Id.* Davis's messages were "permeated with innuendo and marked by attempts to sexually groom the fictitious minor. He brought up topics like her virginity, plied her with compliments, asked when she was not being supervised,

repeatedly attempted to get her to meet him, and offered her gifts including an iPad, an iPhone, payment of her phone bill, and a new bathing suit." *Id.* (footnote omitted). "They eventually agreed that she would skip school and meet him at a McDonalds near her house in Pennsylvania." *Id.* "With their plan in place, the conversation turned explicitly sexual and Marisa expressed concern about getting pregnant. Davis assured her that he would bring 'protection' and personal lubricant." *Id.* "On the morning of the planned meeting, Davis traveled from New York to the McDonalds parking lot where he was arrested by Officer Block [who had been posing as Marisa]." *Id.* "Davis had three condoms in his pocket." *Id.* He was sentenced to 127 months imprisonment. *Id.*

*United States v. Almodovar*, 738 F. App'x 610, 611 (11th Cir. 2018), was a case in which an FBI agent "posing as a bad dad with two daughters," posted an ad on Craigslist titled "Family Time is Fun Time—w4m." The ad said: "Family time is always fun when others are around. Looking for like minded individuals who enjoy the taboo family lifestyle. Must be discreet and non judgmental!!!" *Id.* Almodovar responded to the ad 37 minutes after it was posted. The undercover FBI agent explained that he was a dad with 9- and 11-year-old daughters looking for "new experiences." *Id.* The defendant asked sexualized questions (like whether the 11-year-old wears thongs yet) and asked for pictures of the girls. Upon receiving a picture of the purported 11-year-old, the defendant said that the "pic u sent got me hot" and described the child as "Lickable." *Id.* at 612. The defendant proposed meeting. And he sent a message to the agent/dad: "My imagination is going crazy with what I want to do: kiss, lick, suck." *Id.* The agent asked whether the defendant was referring to the 9- or 11-year-old girl; he responded, "Either or both." *Id.*

> Almodovar proposed that they meet at a certain location. Again, Agent Kaufman [posing as the dad] stated that if they met, and he thought Almodovar was "cool," then they would go to his place on the same day and he would introduce him to his 9- or 11-year-old daughter. He told Almodovar to select a day and which daughter he wanted to meet, and he would keep that daughter out of school. Almodovar responded, "Tuesday morning, 11-year-old." Agent Kaufman asked what the girl should expect and what she should wear. Almodovar responded,

> "Oral. Shorts I guess." Agent Kaufman then asked Almodovar, "Oral
> both ways or her from you or you from her?" Almodovar responded,
> "Both ways."

*Id.* (footnote omitted). Almodovar wanted proof that the dad was sincere so they set up a phone call.
"Almodovar called and a female detective pretended to be the 11-year-old girl on the phone. After
the phone call, Almodovar said, 'She sounds beautiful,' and that he was heading to the predetermined
meeting place." *Id.* at 613. "At the agreed-upon time, Almodovar parked next to the vehicle matching
the description Agent Kaufman had given him. When he opened his car door to get out, he was
arrested." *Id.* The court sentenced Almodovar to 188 months (15.7 years) in prison. *Id.* at 614.

In *United States v. Flechs*, 98 F.4th 1235, 1241 (10th Cir. 2024), the defendant started online
conversations with someone he believed to be a 14-year-old boy. In fact, it was a cop. "Over the next
four days, Mr. Flechs and the minor discussed sexual topics in graphic detail, including oral sex,
masturbation, the size of the minor's penis, and their previous sexual experiences." *Id.* at 1242. "Mr.
Flechs asked multiple times about the minor's sexual desires, and shared his own." *Id.* (citation
omitted). They then discussed meeting in person, and Flechs asked the minor if he would be going
to the skatepark. *Id.* "The minor said yes, and when Mr. Flechs asked when the minor would be there,
the minor asked Mr. Flechs to bring him a Dr. Pepper." *Id.* Mr. Flechs agreed but noted that he
couldn't hang around long and said there would be "no teaching" during the encounter, a euphemism
for sex. *Id.* "When Mr. Flechs arrived at the skatepark, he handed two Dr. Pepper sodas to an officer
posing as the minor. Officers then arrested him." *Id.* He was convicted at trial of attempted enticement
of a minor and sentenced to 10 years in prison. *Id.*

The district court described as "heinous" the facts underlying the offense in *United States v.
Roman*. No. 2:14cr43, 2021 WL 3173351, at *5 (S.D. Ohio July 26, 2021) (recounting facts when
considering motion for compassionate release). Roman placed an ad on Craigslist seeking sexual
interaction with "girls of any age" and an undercover officer responded posing as the parent of an 11-

year-old female. *Id.* Over text message, Roman and the officer "made arrangements to meet for purposes of the defendant engaging in sexual activity with the officer's fictitious daughter." *Id.* "Mr. Roman was arrested soon after he arrived and confirmed to the agent that he wanted to engage in intercourse with the fictitious minor child." *Id.* The district court sentenced Roman to 144 months (12 years) in prison. *Id.* at *1.

The charges in *United States v. Schultz*, No. 17cr193S, 2020 WL 2764193, at *1 (W.D.N.Y. May 28, 2020), "stemmed from Schultz's sexually explicit on-line chats with an undercover law enforcement officer whom he believed to be a minor female." *Id.*

> He preyed on a "girl" whom he solicited online and thought was a 15-year-old high school student. He sent this "girl" numerous sexually explicit messages, describing in great detail the sex acts he would perform on her and that she should perform on him. When this "girl" confessed inexperience, Schultz coached her on how to masturbate and perform sex acts; encouraged her to ask her friends to teach her how to have sex; and instructed her to watch pornographic videos. Schultz sent this "girl" multiple pictures of his exposed genitalia and coaxed her to reciprocate. And throughout the encounter, Schultz instructed this "girl" to keep their communication hidden from her parents and repeatedly sought assurances that they would not get caught. Finally, after again and again asking this "girl" to meet him for sex, Schultz arranged to pick her up to "practice in his van," and he arrived at the meeting point prepared with a condom.

*Id.* at *7. The district court sentenced Schultz to 87 months in prison. *Id.* at *1.

In *United States v. D.W.*, 198 F.Supp.3d 18 (E.D.N.Y. July 28, 2016), the defendant was charged with sexual exploitation of a child. Pornographic photos of a young boy were found on this phone and the investigation showed that the defendant had taken the photos himself. *Id.* at 32. Police found the victim—a boy the defendant had met at church. The boy recalled several instances of hands-on sexual abuse in the defendant's car. *Id.* at 33. The boy identified himself in the photos. *Id.* The defendant in *D.W.* had a prior conviction for sexual abuse and endangering the welfare of a minor child (for which he served three years in state prison). *Id.* at 27. Notwithstanding the more serious offense conduct and past history of hands-on offending against children, D.W. received a sentence of

15 years in prison.

In *United States v. D'Andrea*, 473 F.3d 859, 860 (8th Cir. 2007), the defendant separately initiated conversations with undercover officers posing online as two different 13-year-old girls. The chats were sexual in nature, and the defendant eventually proposed meetings with both girls. "On more than one occasion, he invited the supposed girls to view his web camera, and he masturbated to ejaculation in front of the camera." *Id.* at 861. The defendant then travelled from his home in Wyoming to the girls "homes" in Little Rock, and went to the location of one of the arranged meetings. Officers arrested him, and he admitted intending to have sex with at least one of the girls. "His luggage contained a nightgown, condoms, and lubricant." *Id.* Police also seized recording equipment from his car.

A later search of D'Andrea's computers revealed that he "had carried on chat room discussions with many persons who appeared to be minors." *Id.* at 862. In addition to the chats, "the Defendant employed sophisticated methods … to entice minors and arrange meetings—he sent presents, created an alter ego, and attempted to assuage parents' concerns by posing as a parent of his online personas." *Id.* at 865. The defendant also had a prior conviction that the Eighth Circuit described as "similar." *Id.* at 860. After pleading guilty, D'Andrea was sentenced to an aggregate term of 180 months (15 years) in prison.

In *Armstrong v. United States*, Case No. 1:08cr13, 2010 WL 3635091, at *1 (W.D. Ky. July 12, 2010), a 36-year-old defendant engaged in online chatting with a person he believed to be a 13 year-old minor. In addition to chatting, the defendant used a web-cam to transmit nude images of himself. *Id.* Then the defendant drove to what he believed to be the girl's home and was arrested. *Id.* "Inside the defendant's vehicle law enforcement recovered a box of 14 condoms, a digital camera, and silver bracelet intended as a gift for the 13 year old minor." *Id.* He pleaded guilty and, pursuant to a plea agreement, was sentenced to only 60 months. *Id.*

In *United States v. Grauer*, 701 F.3d 318 (8th Cir. 2012), after months of online sexual banter,

the defendant traveled to have sex with what he believed was a 14-year-old girl. He was arrested at the meeting place. After trial, he was convicted of attempted enticement and possession of child pornography. He was sentenced to an aggregate term of 151 months (12 years, 7 months) in prison. *Id.*

Then there are examples of other cases in this District that may be relevant for comparison purposes:

In *United States v. Aragon*, the defendant responded to a Craigslist posting and engaged in sexually explicit chats with what he believed was a 14-year-old girl. No. 2:16cr129 (E.D. Va. Feb. 27, 2017). Aragon proposed multiple meetings and paid the girl to leave her underwear in a public park for Aragon to retrieve. He then attempted to meet with the 14-year-old girl at a pre-determined location to engage in sexual activity and was finally arrested.

A review of Aragon's cell phone revealed sexually explicit conversation with an identified 15-year-old girl. And there was evidence in *Aragon* that the defendant had asked his real minor victim to send sexually explicit photos. *See Aragon*, 2:16cr129, ECF No. 29-1, at 3 (victim: "yes naked" … Aragon: "Send pics lol"); *id.* at 13 (victim: "this y i dont send u nudes and stuff no more…"). In *Aragon*, the government asked for a ten-year sentence in part because it "would place the defendant in the same position as many defendants charged with the same or similar child pornography offenses." Gov't Pos. on Sent'g, at 15. This Court imposed a ten-year sentence.

In *United States v. Manring*, the defendant "taught at the Remei Hoikuen School, a pre-school in Japan." Gov't Position on Sent'g, at 1 in *Manring*, Case No. 1:13-cr-13 (E.D. Va. Apr. 12, 2013). Over about three years, the defendant "filmed himself performing sexual acts on students who were approximately five years of age. These videos were saved on at least eight DVDs with hours of footage showing his hands-on abuse of these minors, to include oral sex, digital penetration of the children, and the defendant "pressing his erect penis into the vagina of [a] pre-pubescent female." *Id.* at 4. "In

all, the videos show MANRING performing sex acts on at least five boys and two girls. In the scenes in which the children are running around naked, there are at least ten children participating. All of the children are approximately 5 years of age." *Id.* He pleaded guilty to two counts of production of child pornography based on the contact described above. *Id.* The government asked for a sentence of at least 210 months. *Id.* at 1. Judge Hilton of this Court imposed concurrent 168-month sentences. Jmt., ECF No. 33 in *Manring* (May 29, 2013).[13]

In *United States v. Choi*, the government prosecuted a man who had created about 600 videos of child pornography by interacting with minor boys online. Gov't Position on Sent'g in *Choi*, Case No. 1:13-cr-300 (E.D. Va. Feb. 21, 2014). A forensic examination of Choi's computer "discovered 644 videos that were recorded between May 2012 and January 2013 onto the computer from chat rooms and/or Skype using Quicktime Screen Capture." *Id.* at 3. Choi admitted that he used to the computer "to view webcams of underage boys." *Id.* at 2.

> He stated that he used the website Chaturbate to meet underage boys. He would then try to get the underage boys to switch over to Skype, for more "one on one" contact. When the defendant was able to connect with the boys on Skype, he would engage them in sexual behavior. The defendant would record these video chats via the Quicktime Screen Capture program.

*Id.* The forensics confirmed all this. The recovered videos depicted "the lascivious exhibition of the minors' genitals, and/or depict the minors masturbating." *Id.* at 3.

> In some of these videos the defendant is visible in a small inset picture in the lower right corner of the screen, and in some videos the defendant's username is visible. In many of the videos the defendant directs the boys to do certain activities, such as remove items of clothing, switch camera views, or to ejaculate. About 600 of these videos depict boys who are confirmed or suspected to be under the age of 18.

---

[13] These offenses occurred before the PROTECT Act of 2003 increased the mandatory minimum sentence for production from 10 to 15 years.

*Id.* The government argued at sentencing that Choi had "engaged in the exact same behavior with at least ten different victims. Yet, there were approximately 600 videos discovered on the defendant's computer; showing that this was a serious and ongoing pattern of behavior. Law enforcement was only able to identify ten victims, but looking at the evidence shows there are many more whose identities we will never know." *Id.* at 7-8. The government asked for a sentence at the low end of the Guidelines, which was 235 months. *Id.* at 1. Choi was about 34 years old at the time of the offense, so youth did not play any role in his offense.[14] Judge Trenga of this Court imposed a sentence of 186 months' imprisonment. Jmt, ECF No. 43 in *Choi* (Feb. 28, 2014).

*United States v. McGalem* is a 2022 case from this District in which the defendant received a sentence of 192 months. Jmt, ECF No. 56 in *McGalem*, Case No. 1:22-cr-48 (E.D. Va. Nov. 9, 2022). "For more than a year, the defendant befriended prepubescent and pubescent boys online, convinced each one that he was their friend, sexualized the friendship, then manipulated the boys so they would send him sexually explicit photos." Gov't Position on Sent'g, at 1, ECF No. 52 in *McGalem*. "The government's investigation of the defendant [in *McGalem*] began when the mother of a 9-year-old boy (Minor Victim 1) alerted law enforcement that the defendant had been cultivating a relationship with her son online." *Id.* at 2. Those chats "reflect a pattern that the government eventually found the defendant using with multiple victims: friendship based on mutual interests, sexualization of the friendship, followed by demands for child pornography and emotional manipulation." *Id.* In addition to the overtly sexual chats, the defendant lured Minor Victim 1 with "awesome ass sleep overs" and promised to live with the nine-year old victim "'[w]hen I get my own place,' promising that he would 'never say any of our conversations to anyone else,' and insisting that he loved Minor Victim 1. But the conversation rarely strayed far from McGalem's sex life and his attempts to further sexualize his

---

[14] As of August 5, 2025, the BOP's inmate locator lists Mr. Choi as being 47 years old. Thus, 12 or 13 years ago (during the offense conduct in 2012-2013), he was about 34 years old.

relationship with Minor Victim 1." *Id.* That was just Minor Victim 1. As to Minor Victim 2, "who was under the age of 12 years at the time," McGalem persuaded him "to take and send pictures of his penis." *Id.* at 5. At least one more of the identified production victims was under age 12. *Id.* at 7. The Guidelines in that case recommended life (restricted to the 50-year statutory maximum). *Id.* at 1. But this Court imposed 192 months (16 years).

In *United States v. Muniz*, the government described the nature of the offense as "incredibly serious." Gov't Position on Sent'g, at 3, ECF No. 38 in *Muniz*, Case No. 2:24cr8 (E.D. Va. Oct. 4, 2024). The investigation into Muniz began "when he responded to an online advertisement of an undercover law enforcement officer posing as the father of a 10-year-old daughter. The defendant quickly arranged a meeting to engage in a sex act with what he believed was a 10-year-old child." *Id.* at 3-4. Muniz arrived at the agreed-upon meeting location and spoke to an undercover law enforcement officer, agreeing to rules set by the undercover agent. *Id.* at 4. When police searched Muniz's phone they found child pornography and chats with "conversations regarding buying and purchasing CSAM." *Id.* Forensics on his phone also revealed a "a conversation from January 15, 2024, to January 17, 2024, with an individual who identified himself/herself as a junior in high school." *Id.* Muniz was 36 years old. *Id.* Muniz solicited sex online with a 10-year-old, traveled to have sex with the child, and then discussed ground rules for that sex with the purported parent of that child; then his phone turned up an entirely separate chat with another apparent minor and CSAM transactions. He was sentenced to 150 months.

In light of both national sentencing data and examples of specific cases (both nationally and in the Eastern District of Virginia), a sentence of 20 years would not create unwarranted sentence disparity.

* * *

Justin Whichard has need help his whole life. Growing up, he couldn't catch a break. Given

27

the 15-year mandatory minimum he faces, he is not going to catch a break now either. He committed serious offenses and will face a serious federal prison sentence. Justin's offenses were deplorable, but he can be rehabilitated through drug treatment, sex offender treatment, and the maturation that will come with time. A sentence exceeding 20 years for a crime committed at age 22 is greater than necessary.

Respectfully submitted,

JUSTIN WHICHARD

By:_____/s/_____
Andrew W. Grindrod
Virginia State Bar No. 83943
Office of the Federal Public Defender
500 East Main Street, Suite 500
Norfolk, Virginia 23510
Telephone: 757-457-0800
Telefax:  757-457-0880
Email:  andrew_grindrod@fd.org